## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA

### PENSACOLA DIVISION

SHNEIDRE NEAL,

     Plaintiff,

v.                           Case No. 3:00-cv-277/LAC

MANPOWER INTERNATIONAL,
INC. and WAYNE-DALTON CORP.,

     Defendants.

_____/

## ORDER  GRANTING SUMMARY JUDGMENT AND ORDER GRANTING SUMMARY JUDGMENT IN PART AND DENYING SUMMARY JUDGMENT IN PART

This cause comes  before the Court on Defendants' motions for summary judgment and documents in support thereof (Docs. 60, 70–72).  Plaintiff timely filed a memorandum and evidentiary materials in opposition (Docs. 87–90, 92).  Defendant Wayne-Dalton Corp. also moved to strike Plaintiff's affidavit (Doc. 94) and Plaintiff filed a timely response (Doc. 95).  The Court has taken both motions for summary judgment under advisement (Docs. 68, 76), and is now prepared to rule on all pending motions.  For the reasons stated below, Defendant Manpower International, Inc.'s motion for summary judgment is **GRANTED**. Defendant Wayne-Dalton Corp.'s motion to strike is **DENIED** as moot, and its motion for summary judgment is **GRANTED** in part and **DENIED** in part.

Entered On Docket:   September 18, 2001             By: jrm
Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP
Copies sent to:   KELLY, LUNNY, RODGERS, FREEMAN, SMITH

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
PENSACOLA, FLA.

01 SEP 18  AM 10: 09

mjm
FILED

**106**

## I. STATEMENT OF THE CASE

### A. Background

The facts giving rise to this lawsuit are sharply disputed by the parties. The following rendition of the facts resolves those disputes in the light most favorable to the Plaintiff, the non-moving party.[1]

Defendant Wayne-Dalton Corporation ("Wayne-Dalton") is an Ohio Corporation, with its principal place of business in Ohio, licensed to conduct business in the State of Florida (Doc. 60, Ex. 1). Wayne-Dalton manufactures garage doors, garage door components, and garage door operators and sells and distributes its products throughout the United States (Doc. 60, p. 1). One of Wayne-Dalton's manufacturing facilities is located in Pensacola, Florida (Doc. 60, p. 1; Doc. 71, ¶ 1).

Defendant Manpower International, Inc. ("Manpower") is a Delaware Corporation with its principal place of business in Wisconsin (Doc. 1). Manpower is a temporary help company that, pursuant to a contract with Wayne-Dalton, provides temporary workers to Wayne-Dalton's Pensacola manufacturing facility (Doc. 60, p. 1; Doc. 71, ¶ 1–2). Manpower neither takes part in the management or operations of the Wayne-Dalton facility, nor does Manpower have authority or control over Wayne-Dalton employees (Doc. 71, ¶ 3). However, Manpower does recruit and interview applicants for positions in the Wayne-

---

[1] Some of the facts are construed according to Local Rule 56.1(A). Where the Court cites to a specific portion of either Defendants' statements of undisputed facts, (Doc. 60, p. X; Doc. 71 ¶ X.), Plaintiff has failed to controvert that specific fact, and it is therefore deemed admitted for the limited purpose of ruling on Defendants' motions.

Dalton plant (Doc. 62, p. 5). Manpower has an office at the Wayne-Dalton facility and employs "on-site supervisors" who will typically walk through the plant and encourage dialogue with Manpower employees (Doc. 72, ¶ 11). The supervisor facilitates issues safety equipment selected by Wayne-Dalton, interacts with Wayne-Dalton supervisors to identify openings, and facilitates any terminations or counselings of employees (Doc. 62, p. 5). Additionally, Manpower provides salaries to temporary employees at the Wayne-Dalton facility and issues rules to its employees—such as policies regarding appropriate attire and attendance (Doc. 90, Ex. 3).[2]

Under the attendance policy, which is based on a cumulative point system, an employee is assessed a point amount ranging from ½ of a point to 1 point for each instance of tardiness or unexcused absence (*Id.*). If an employee receives "over 3 points," then the employee is summarily terminated (*Id.*).

Except for the attendance policy, Manpower does not unilaterally terminate employees as the Wayne-Dalton plant on its own motivation (Doc. 62, p. 13). Rather, Manpower takes direction for terminations from Wayne-Dalton supervisors (*Id.*). Essentially, if a Wayne-Dalton supervisor tells Manpower that the Manpower employee needs to be terminated, Manpower removes the employee from the plant (*Id.*).

Manpower has a formal, written policy prohibiting sexual harassment (Doc. 71, ¶ 5). Copies of the policy are distributed to every new Manpower employee and are posted in its

---

[2] While Manpower issues the absentee policy to its employees, the progressive point absentee policy was created by Wayne-Dalton (Doc. 62, p. 14).

Pensacola facility (*Id.*).[3] If an employee complains to Manpower of potential harassment from a Wayne-Dalton employee, Manpower collects information from the Manpower employee and tenders the information to Wayne-Dalton for investigation (*Id.* at ¶ 8).[4] Once the investigation is complete, Wayne-Dalton typically prepares a written report that summarizes the extent of the investigation of their employee and the result and sends a copy of the investigation report to Manpower (*Id.* at ¶ 9). Manpower receives and reviews the report and transmits the investigation results to the complaining Manpower employee (*Id.*). Manpower will convene a meeting with Wayne-Dalton officials to revisit the issue or take other remedial action within its control in either of two situations: Where Manpower is not satisfied with the investigation or when the affected Manpower employee expresses dissatisfaction with the result of the investigation (*Id.*). Additionally, Wayne-Dalton also has in place its own sexual harassment policy which is posted on six employee bulletin boards, located near time-clocks within the facility (Doc. 60, p. 3). Wayne-Dalton's policy requires, *inter alia*, that upon being made aware of a sexual harassment complaint, Wayne-

---

[3] In addition to its sexual harassment policy, Manpower conducts biannual sexual harassment training of its staffing employees at the Wayne-Dalton facility using a "Sexual Harassment Awareness Test" (Doc. 71, ¶ 6). Manpower also circulates a booklet entitled "About Sexual Harassment in the Workplace," Manpower's Sexual Harassment Policy, and the "Complaint Procedures for Manpower Employees Working at Wayne Dalton" (*Id.* at ¶ 7). Further, Manpower requires its employees at the Wayne-Dalton facility to take the Awareness Test and discuss the answers/results, and encourages discussion about sexual harassment issues and the complaint procedures (*Id.* at ¶ 6).

[4] This procedure stems from Manpower's inability to discipline, demote or discharge a Wayne-Dalton employee and a resulting agreement between Manpower and Wayne-Dalton to provide a system to investigate any Manpower employee's complaint of sexual harassment by a Wayne-Dalton employee (Doc. 71, ¶ 8).

Dalton representatives will reduce the complaint to writing (*Id.*).[5]

On 22 June 1999, Plaintiff Shneirdre Neal completed and submitted an application for employment at the Manpower office located at the Wayne-Dalton facility (Doc. 61, pp. 15–17). Neal admits that her application for employment contained numerous intentional misrepresentations including the extent of her education, her previous employers, and the reasons Neal separated from her previous employers (Doc. 60, p. 2; Doc. 71, ¶ 10). Manpower would have required Neal's "separation" from Manpower had it known that Plaintiff had made such intentional misrepresentations (Doc. 71, ¶ 11). On or about 23 June

---

[5] The Wayne-Dalton sexual harassment policy provides in relevant part:

> Any person who is aggrieved by any form of sexual harassment, who feels comfortable doing so, should directly inform the offending person that the conduct is offensive and must stop. Thereafter, the offensive conduct is to be reported to the employee's supervisor or other management personnel.
>
> If the aggrieved person does not wish to communicate directly with the offending person, or if the direct communication with the offending person is not successful, the aggrieved person shall contact the offending person's immediate supervisor, their own supervisor or to the Complaint Resolution Committee or their Human Resource Representative. If the complaint involves someone in the employee's direct line of supervision, then the employee should inform another supervisor of the complaint or contact a Corporate Human Resource Manager at Wayne-Dalton Corp. corporate offices at (330) 674-7015. All complaints for sexual harassment will be reduced to writing and promptly investigated by Wayne Dalton representatives for appropriate remedial action. The process of filing a complaint and the ensuing investigation will be held in confidence and will be shared only with the appropriate people who "need to know," but strict confidentiality cannot be guaranteed.
>
> Although there shall be no express time limits for initiating a complaint of sexual harassment, every effort should be made to file a complaint or report an incident of sexual harassment as soon as possible, preferably within 48 hours after any incident occurs. By doing such, the facts and potential supporting witness statements are readily available.

(Doc. 60, p. 3).

1999, Plaintiff reported to the Manpower office and was assigned by Manpower to perform temporary work in the Wayne-Dalton Pensacola facility (*Id.*).

On 24 June 1999, Neal began working at the Wayne-Dalton facility as a production worker (Doc. 90, Ex. 1, p. 6).  Neal was supervised by "Leadperson" Sally Robertson, a Wayne-Dalton employee, and Kenny Woodson, another Wayne-Dalton employee (Doc. 90, pp. 22–23; Doc. 60, Ex. 4, ¶ 1).  Neal contends that soon after Woodson became the supervisor of Neal's shift, Woodson made a series of statements to her during her employment.  Within the first week to week and a half of her employment, Neal attributed Woodson with:

- asking whether Neal had a boyfriend and how many children she had (Doc. 61, p. 38);
- stating that "[H]e would be better than her boyfriend" (*Id.* at 127);
- stating that "You don't know what I could do to you" (*Id.* at 121–22);
- stating, "Oh, don't bend over like that,"while Neal was bending to get rubber hoses (*Id.* at 38–39, 115); and
- stating, "oh, you fine" when Neal was on her way to the water fountain (*Id.* at 38–39, 119–20).

Neal also attributes Woodson with:

- staring at Neal's chest when speaking to her (*Id.* at 117);
- separating male employees from female employees (Doc. 61, p. 71);
- treating men contemptibly "essentially when they would talk to" Neal (*Id.* at 38–39, 119–20);
- asking "[D]o you have a man[?]  If not do you have a woman[?]," which was attributed to Woodson in a letter written by Neal after her removal from the plant (Doc. 61, Ex. G, p. 1);
- reaching in front of Neal to obtain a box of screws and brushing his arm against Neal's chest (Doc. 61, pp. 33–34, 118–19);
- walking through the line Neal was in and "brushing" Neal's backside with his frontside, grabbing and squeezing Neal's hip, and winking his eye at Neal (*Id.* at

34–35); and
- asking Neal what she was doing after work (*Id.* at 32).

In Neal's last week of employment at the Wayne-Dalton plant, Neal attributes Woodson with:

- stating that Neal's "lips would look good on his dick" (*Id.* at 37, 114–15);[6]
- looking at Neal and then looking down at Woodson's "self" (*Id.* at 122); and
- when Neal was showing a male co-worker how to "catch the screws on the doors," approaching Neal and stating, "I see you're up here falling in love, I'm going to have to move you" (*Id.* at 29–30).

Every instance provided by Neal occurred once and Neal is unaware of any other witnesses to Woodson's actions (*Id.* at 114–23). Further, Neal is unaware of any witnesses to Woodson's statements, which—due to the noise generated in the assembly area—would be inaudible to other employees (*Id.* at 38, 120).

During Neal's employment, she "probably was late" to her workstation "once or twice" (Doc. 61, p. 24). However, under the Manpower/Wayne-Dalton progressive absentee absence policy, Neal had not accumulated enough points to be summarily discharged due to her attendance (*Id.*).[7]

_____

[6] Despite speaking to Robertson about "everything," lodging a complaint of sexual harassment with Manpower after her removal from the plant, and lodging a complaint with the Florida Commission on Human Relations, *see* FLA. STAT. ANN. § 760.03 (2001), Neal makes this charge for the first time in her deposition (Doc. 61, pp. 37–38, 114–15).

[7] The exact number of attendance points that Neal accumulated and when they were assessed is not only ambiguous in Neal's deposition (Doc. 61, pp. 23–24), but the exact method of computation is an issue of considerable dispute by the parties. Neal asserts that she had 1-2 points, while Wayne-Dalton asserts that Neal had 2 ½ points (*Compare* Doc. 60, p. 4 *with* Doc. 87, p. 12). Notwithstanding, Neal would not have met the termination requirement of "over 3 points," irrespective of which method of computation—if either—is proper (Doc. 90, Ex. 3). Thus, the Court need not delve into the abyss of ambiguities presented by Neal's attendance point assessment at this

On Wednesday, 4 August 1999, a confrontation occurred between Neal and a co-worker regarding the division of duties (Doc. 60, p. 4). Neal told the co-worker that his manner of speaking to her was "rude" and Woodson counseled both Neal and her co-worker, although Woodson's counseling was directed more toward Neal's co-worker than Neal (Doc. 61, pp. 25–27).

Also on Wednesday, 4 August 1999, Woodson called Neal into the office and, in the presence of Robertson, told Neal that she was doing "a great job" and to "keep up the good work" (*Id.* at 28). Later that day, Woodson counted money in Neal's face and stated, "[H]ow much money would it take, everybody [*sic*] has a price" and then stated "[I] can make [your] job hard or [I] can make it easy, which [*sic*] one you [*sic*] want it to be" (*Id.* at 30). Neal told Woodson, "[M]ake it hard for me" (*Id.* at 41). That evening, Neal approached Robertson, asked if Robertson had noticed the way Woodson was treating her, and told Robertson that Woodson was sexually harassing her (*Id.* at 32–33, 57). After Robertson acknowledged that she had noticed the way Woodson treated Neal, Neal stated that she needed to talk to one of Woodson's superiors (*Id.* at 33).

Also during her 5 August 1999 shift, Neal was sitting at her work station, as she "normally" did, rather than stacking parts or performing other job functions (Doc. 61, pp. 42–43; Doc. 60, p. 5). Woodson confronted Neal about sitting, however, he did not confront other employees that were also sitting at their workstations (Doc. 61, pp. 42–43).

_____

time.

Neal then had a conversation with Robertson where she expressed that Woodson had singled her out for discipline, counseling or instruction when other employees were not disciplined, counseled or instructed for similar conduct or infractions (*Id.* at 42–44). Robertson replied that Neal was "doing good" and that everyone in the facility was aware of Woodson's "aggressive" behavior (*Id.*).

At 2:30 a.m., the end of her 5 August shift, Neal was in the process of clocking out when Woodson asked, "[W]hat's it going to be[?]," presumably in reference to his statement that he could make Neal's job "hard" or "easy" (*Id.* at 41). Neal gave no answer and walked away (*Id.*).

On Monday, 9 August 1999, Neal's next scheduled work day, Neal came in early to talk with Manpower employee, Debbie Glaze (*Id.* at 58). However, Woodson, who was present at the facility when Neal arrived, confronted Neal and told her to report to the Manpower office because she had been fired (Doc. 61, p. 58). Neal then learned from Manpower that a Wayne-Dalton supervisor, specifically Woodson, had requested her removal from the facility and, pursuant to the Wayne-Dalton/Manpower agreement, Manpower removed Neal from the facility (Doc. 62, p. 13). Woodson's basis for removal was "poor work performance" (*Id.* at 17). Neal completed Manpower's exit interview form and an extensive narrative alleging Neal had been sexually harassed by Woodson (*Id.* at 20–21). Although Neal had previously complained to Manpower about Woodson's aggressive behavior, prior to receiving this narrative, Neal never indicated to Manpower that

she felt sexually harassed by Woodson (Doc. 61, p. 58–60).

After learning of Neal's complaint and obtaining Neal's detailed, written account of her allegations, Manpower informed Wayne-Dalton of the allegations (Doc. 71, ¶ 15). Wayne-Dalton conducted an investigation which resulted in:

- noting a charge of discrimination in Woodson's personnel file;
- commencement of a formal investigation of Neal's charge, including investigation and interview of Woodson;
- receipt of Woodson's admission to making the statement that Neal was "flirting on the line," and his denial of the allegation that he made a statement to Neal concerning whether or not Neal had a man or woman and that he was moving Neal because Neal was "falling in love" at work;
- interviewing Robertson and receiving a statement by her in support of Woodson's version of the events and a denial of Neal's allegations;
- counseling of Woodson on his poor choice of language;
- instructing Woodson that, as supervisor, he had an obligation to be aware of and sensitive to issues of sexual harassment; and
- requiring Woodson to review and execute another copy of the sexual harassment policy.

(Doc. 71, ¶ 15; Doc. 60, p. 8).  No other disciplinary action was taken against Woodson (Doc. 60, p. 8).   Wayne-Dalton generated and transmitted a summary report of the investigation to Manpower (Doc. 71, ¶ 16).  Manpower reviewed the report and prepared a follow-up letter to Neal (*Id.* at ¶ 17).  When Neal visited the Manpower office on 30 August 1999, Manpower's Pensacola Branch Manager, Barbara Murphy, personally delivered the follow-up letter to Neal and discussed continuing employment with her (*Id.*). Neal neither indicated that she was dissatisfied with the result of the investigation, nor that there were any additional allegations against Woodson (*Id.*).

Manpower also contacted Neal when the Wayne-Dalton investigation was in progress

to offer her alternative employment positions (Doc. 71, ¶¶ 18–21).  Neal failed to appear for the examination to determine her skill level and failed to attend any scheduled work at alternative employers (*Id.*).  Neal never communicated a reason for her absence to Manpower (*Id.*).  After Manpower was informed that Neal had located alternative employment, it prepared a separation notice and Neal's resignation (*Id.* at ¶ 16).

## B.  Procedural History

Neal filed a Charge of Discrimination with the Florida Department of Human Resources and after Neal received notice that the Department would not complete its investigation, the Department issued a 180-day letter (Doc 60, p. 11).  Neal then filed this lawsuit in the Circuit Court for Escambia County, Florida, on 7 June 2000 (Doc. 1, Ex. A).  Defendants subsequently removed the instant action to federal court pursuant to Title 28, United States Code, Section 1441 (Doc. 1).

The parties completed discovery.  Thereafter, Defendants filed motions for summary judgment and documents in support thereof (Docs. 60, 70–72).  Neal has timely responded (Docs. 87-90, 92) and the Court has taken the motions under advisement (Docs. 68, 76).  Also pending is Wayne-Dalton's Motion to Strike Plaintiff's Affidavit (Doc. 94) which Neal opposes (Doc. 95).

In her two-count complaint, Neal alleges sexual harassment and retaliation in

violation of the Florida Civil Rights Act of 1992 ("FCRA") (Doc. 1, Ex. A).[8] FLA. STAT. ANN. § 760 *et seq.*

## II. MOTION TO STRIKE

Wayne-Dalton moves to strike Neal's affidavit submitted in opposition of summary judgment (Doc. 94). Although styled as a motion to strike, Wayne-Dalton's motion actually contains two separate motions to the Court. First, Wayne-Dalton moves to strike Neal's *affidavit* on various grounds. Second, appendaged to the end of its motion to strike, Wayne-Dalton moves the court to disregard a statement by Neal that appears in her *sworn deposition* because it is incredible. Wayne-Dalton's motion to strike Plaintiff's affidavit is **DENIED** as moot, and Wayne-Dalton's motion to disregard Plaintiff's statement as incredible is **DENIED**. Each of these motions are considered in turn below.

### A. *Motion to Strike the Affidavit*

Wayne-Dalton moves to strike Neal's affidavit in its entirety on various grounds, including that it is (1) not based on personal knowledge, (2) relies on inadmissible hearsay, (3) includes conclusory statements, and (4) inexplicably contradicts Plaintiff's earlier sworn deposition testimony. Neal responds, *inter alia*, that even if Wayne-Dalton is correct,

---

[8] Because the FCRA is patterned after Title VII, federal caselaw dealing with Title VII claims also applies to its Florida counterpart. *See Joshua v. City of Gainesville*, 768 So. 2d 432, 435 (Fla. 2000); *see also Kelly v. K.D. Const. of Florida, Inc.*, 866 F. Supp. 1406, 1411 (S.D. Fla. 1994).

Wayne-Dalton's motion to strike the entire affidavit provides the improper remedy and the Court should only disregard those specific portions of the affidavit that the Court determines to be legally improper. *See Lee v. Nat'l Life Assurance Co. of Canada*, 632 F.2d 524, 529 (5th Cir. 1980), *reh'g denied*, 635 F.2d 516 (1981).[9] Accordingly, Neal urges that the Court employ a "paring knife" rather than a "chainsaw" as the "appropriate tool" in considering Neal's affidavit.

While Neal is correct regarding the proper method of approaching her affidavit, the Court believes that it would be futile to undertake such an expansive enterprise. As explained below, *without considering Neal's affidavit and relying solely upon her deposition testimony*, genuine issues of fact exist meriting denial in part of Wayne-Dalton's motion for summary judgment. Furthermore, the portion of Wayne-Dalton's motion for summary judgment that is granted in part would be granted, *even if the affidavit were considered* by the Court.[10] Therefore, considering the Court's result on Defendants' motions for summary judgment, the Court can decide the issues before it *without determining the admissibility of Neal's affidavit*, and Neal's request to attempt to dissect her affidavit into something resembling admissible evidence would be nothing more than an academic exercise.

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

[10] Although Manpower did not join in Wayne-Dalton's motion to strike Neal's affidavit, Manpower's motion for summary judgment would be granted whether or not the Court considered Neal's affidavit.

Accordingly, Wayne-Dalton's motion to strike Neal's affidavit is **DENIED** as moot.

### B.  Motion to Disregard Deposition Testimony as Incredible

In a less than orthodox fashion, Wayne-Dalton also moves the Court to disregard Neal's deposition statement that attributes Woodson with saying Neal's "lips would look good on his dick."  Wayne-Dalton readily admits that the statement appears in Neal's deposition, but argues that because Neal candidly admits not mentioning the statement to any Manpower or Wayne-Dalton employee or supervisor, in her Manpower exit interview, her written sexual harassment complaint to Manpower, or her Charge of Discrimination to the Florida Department of Human Resources, and only suddenly recalled its utterance in her sworn deposition, it is too incredible for the Court to believe that the statement was ever made.  While the circumstances of Neal's recollection of this statement reside along the outer bounds of believability, at the summary judgment stage, the Court does not resolve factual issues.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  Rather, the Court must resolve all ambiguities draw all justifiable inferences in favor of the non-moving party.  *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993), *reh'g denied*, 16 F.3d 1233 (1994).  The Court does not believe, *as a matter of law*, that Neal is too incredible to be believed.  Therefore, solely for the purpose of summary judgment, the Court must resolve the factual dispute in favor of Neal and assume that the statement was made.  Accordingly, Defendant's motion

to disregard Plaintiff's statement is **DENIED**.

### III. MOTIONS FOR SUMMARY JUDGMENT

#### A. *Standard*

Although the Court is sitting in diversity in this matter, the burden of proof on a motion for summary judgment is governed by federal standards. *See Anderson*, 477 U.S. at 248–50, 106 S. Ct. at 2511. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[T]he substantive law will identify which facts are material" and which are irrelevant. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *See id.*

At the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. *See id.* at 249, 106 S. Ct. at 2510–11. A genuine issue exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. *See id.* "If reasonable minds could differ on the inferences arising from undisputed

facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity and Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

When assessing the sufficiency of the evidence in favor of the non-moving party, the court must view all the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party." *Hairston*, 9 F.3d at 918. The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the non-moving party is "merely colorable or is not significantly probative . . . ." *Anderson*, 477 U.S. at 249–50, 106 S. Ct. at 2511 (citations omitted). "A mere 'scintilla' of evidence supporting the . . . [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512).

## B. Discussion

### 1. Manpower's Motion for Summary Judgment

Manpower's motion for summary judgment presents the issue whether a temporary staffing company has a duty to protect employees it places in other companies from non-employee supervisor sexual harassment in violation of the FCRA. The issue presents a two-prong inquiry. First, the Court must determine whether Manpower is an "employer" within

the FCRA, and second, the Court must determine if a basis exists for holding it liable as an employer for the alleged harassment. *See Virgo v. Riviera Beach Associates, Ltd.*, 30 F.3d 1350 (11th Cir. 1994) (satisfying that corporation was employer with sufficient number of employees for Title VII liability, then finding sufficient agency relationship to establish vicarious liability); *see also Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S. Ct. 2399, 2408, 91 L. Ed. 2d 49 (1986) (determining Congress wanted courts to look into agency principles for determining Title VII liability).  While the parties dispute whether a temporary employment agency can be considered an "employer" under the FCRA, the Court need not explore that question, as it is mooted by the Court's findings on the second question.[11]  Therefore, the Court turns to whether a basis exists for holding Manpower liable for Neal's alleged sexual harassment.

---

[11] Manpower claims that they are not an "employer" within the meaning of the FCRA. Florida courts have not spoken on the issue.  Further, there is a significant split of authority on whether a temporary employment company is an "employer" under Title VII.  *See Riesgo v. Heidelberg Harris, Inc.*, 36 F. Supp. 2d 53, 58 (D.N.H. 1997); *compare Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F. Supp. 344, 349 (S.D.N.Y. 1984) (assuming that employee who brought Title VII complaint against company to which she was assigned by temporary agency was employee of temporary agency), *aff'd sub nom. Aharnare v. Marrill Lynch*, 770 F.2d 157 (2d Cir. 1985), *with Williams v. Caruso*, 966 F. Supp. 287, 295–96 (D. Del. 1997) (determining employment agency not plaintiff's employer because it did not play a role in the manner and means by which plaintiff's work was accomplished), *Astrowsky v. First Portland Mortgage Corp.*, 887 F. Supp. 332, 336 (D. Me. 1995) (employment agency not plaintiff's employer where it exercised no control over him as employee), *and Kellam v. Snelling Personell Servs.*, 866 F. Supp. 812, 815–16 (D. Del. 1994) (excluding temporary employees in determining whether employment agency employed more than fifteen employees and thus fell within purview of Title VII).  Rather than attempt to speculate on the way that the Florida Supreme Court will resolve this conflict, the Court will simply assume, without deciding, that Manpower is an "employer" within the meaning of the FCRA.  *Cf. Riegso*, 36 F. Supp. at 58 (recognizing conflict on Title VII's definition of employer and proceeding *arguendo* that employment agency is an employer).

Manpower asserts that its only duty when its employees are being sexually harassed by a job-site supervisor employed with the client company is to remove its employee from the job site and relocate the employee to another job site, an action that is within its control. *See Caldwell v. ServiceMaster Corp.*, 966 F. Supp. 33, 47–48 (D.D.C. 1997); *e.g.*, *Williams v. Caruso*, 966 F. Supp. 287, 298 (D. Del. 1997).  Neal retorts this position by urging that an employee of a temporary staffing company may be analyzed under either the borrowed servant doctrine or the joint employer doctrine.  Under either doctrine, Manpower is entitled to summary judgment.

Neal first claims that the borrowed servant or loaned servant doctrine provides a basis for holding Manpower liable for Woodson's actions.  While no party refers the Court to a Florida case on point, Neal refers the Court to a United States District Court of the Middle District of North Carolina decision by Chief Judge Bullock, *Mullis v. Mechanics & Farmers Bank*, 994 F. Supp. 680 (M.D.N.C. 1997).  Neal references the case for the narrow proposition that a temporary employee can concurrently be considered an employee of a temporary staffing company and the client employer.  However, Judge Bullock's analysis is considerably more instructive than Neal acknowledges.

In *Mullis*, Chief Judge Bullock explored the liability of a temporary staffing company under Title VII.  Based on the Fourth Circuit's direction that courts are guided by "the conventional master-servant relationship as understood by common-law agency doctrine," Chief Judge Bullock determined that temporary staffing company liability should be

analyzed under the loaned-servant doctrine, which provides "that an employee directed or permitted to perform services for another 'special employer' may become the special employer's employee while performing those services." 994 F. Supp. at 684–85 (citing *Maynard v. Kenova Chem. Co.*, 626 F.2d 359, 361 (4th Cir. 1980)(per curiam); RESTATEMENT (SECOND) OF AGENCY § 277 (1958)).[12]  Further, in situations where the special employer "controls the means and manner of the temporary employee's work, the temporary employee is considered an employee of *both* the temporary agency and the special employer." *Mullis*, 994 F. Supp. at 685.

While Neal's analysis ceases with the above proposition, Chief Judge Bullock continued. *Mullis*, 944 F. Supp. at 685 ("[f]inding that [the temporary service agency] was Plaintiff's employer does not end the inquiry"). A "complaint must also assert a basis for holding an employer liable for the alleged harassment." *Id.*; *see also Meritor Savings Bank, FSB*, 477 U.S. at 72, 106 S. Ct. at 2408 (holding that Congress intended traditional agency principles to govern employer liability under Title VII). Chief Judge Bullock then turned to the Fourth Circuit, which has established that "an employer is liable for [sexual

_____

[12] As the Court is sitting in diversity, when reference is made to common-law principles, as substantive law, the Court follows state substantive law. *See Erie R.R Co. v. Thompkins*, 304 U.S. 64, 78–80, 58 S. Ct. 817, 822–823, 82 L. Ed. 1188 (1938). The parties did not point the Court to any substantive Florida law on employer liability.  While the Court was unable to locate any cases on this issue under the FCRA, in worker's compensation cases, Florida courts have applied the doctrine of joint employment and  turned to common law principles to determine whether parties qualify as joint employers. *See West Contract Servs. v. Rohr*, 665 So. 2d 317, 317–18 (Fla. 1st DCA 1996), *review denied*, 675 So. 2d 931 (1996); *Hollis v. Sch. Bd. of Leon County*, 384 So. 2d 661, 663 (Fla. 1st DCA 1980).  A discussion of the application of this doctrine follows.

harassment] created by a supervisor or other employee *only if the employer knew or should have known* of the illegal conduct and failed to take prompt and remedial action." *Mullis*, 994 F. Supp. at 685 (citing *Andrade v. Mayfair Management, Inc.*, 88 F.3d 258, 261 (4th Cir. 1996)) (citations omitted). Chief Judge Bullock supported the "know or should have known" standard in cases of harassment by non-employees by turning to the Equal Employment Opportunity Commission (EEOC) guidelines on sexual harassment. *Mullis*, 994 F. Supp. at 685–86. The guidelines provide, "An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, *where the employer* (or its agents or supervisory employees) *knows or should have known of the conduct* and fails to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11(e) (2000)(emphasis added).[13]

Alternatively, Neal argues that Manpower is liable for Woodson's sexual harassment under the FCRA as a "joint employer." Assuming that Manpower is a joint employer, in order for an employer to held liable for sexual harassment of non-employees, "a plaintiff must show that the defendant knew or should have known of the discriminatory conduct and that it failed to take those corrective measures within its control." *Caldwell*, 966 F. Supp.

---

[13] In *Mullis*, the Plaintiff reported the sexually harassing conduct to the appropriate supervisor, making the corporate employer aware of the conduct. 994 F. Supp. at 685. However, the corporate employer took no effort to investigate or remedy the situation, subjecting them to Title VII liability. *Id.*

In addition to referencing *Mullis*, Neal string cites a series of other cases to support various propositions that she claims lead to Manpower's borrowed servant liability. Each of these cases is distinguishable from the instant case.

at 46; *accord Magnuson v. Peak Technical Servs., Inc.*, 808 F. Supp. 500, 513 (E.D. Va. 1992), *aff'd on other grounds*, No. 93-1032 (4th Cir. 1994) (referencing EEOC Guidelines on Sex Discrimination, 29 C.F.R. § 1604.11(e) in order to come to same conclusion when issue presented as first impression in circuit).

Neal's argument in refutation is that the United States Supreme Court, in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998), determined that since Neal suffered an adverse employment action, Manpower, as her employer, need not be provided with notice of any claim of sexual harassment.  Neal's position is essentially that Manpower should be vicariously liable for the harassment she attributes to Wayne Dalton's employee, Woodson.

In both *Faragher* and *Ellerth* the plaintiffs filed suit against their employers due to actions of their supervisors.  *Faragher*, 524 U.S. at 780–83, 118 S. Ct. at 2280–81; *Ellerth*, 524 U.S. at 747–51, 118 S. Ct. at 2262–64.  However, in both cases, *the supervisors were also employees of the same employer* as the plaintiff and vicarious liability was assessed to the employers due to an agency relationship.  *See Ellerth*, 524 U.S. at 755–66, 118 S. Ct. at 2265–71.  Furthermore, much of the reasoning in these cases was based on the proposition that a "supervisor has been empowered by the company as a distinct class of agent" to make economic and employment decisions."  *Ellerth*, 524 U.S. at 762, 118 S. Ct. at 2269.

Such a relationship does not exist in the instant case.  Woodson, Neal's supervisor,

was an employee and agent of Wayne-Dalton, not Manpower. Furthermore, the additional reasons that the *Faragher* Court found employer liability appropriate are not present in the case of an employment placement agency such as Manpower. Manpower neither takes part in the management or operations of the Wayne-Dalton facility, nor does Manpower have authority or control over Wayne-Dalton employees. Since Wayne-Dalton supervisors are Wayne-Dalton employees, Manpower neither has an "opportunity to guard against [their] misconduct," nor to "screen them, train them, and monitor their performance." *Faragher*, 524 U.S. at 803, 118 S. Ct. at 2291. Accordingly, this Court finds the cases that more directly explored the temporary employment agency relationship more applicable.

However, if the Court were to assume that Manpower were an "employer," under the *Ellerth/Farager* analysis, the next step in the analysis is to determine whether Manpower took a tangible employment action against Neal. *Ellereth*, 524 U.S. at 760, 118 S. Ct. at 2268. In the instant case, Woodson and Wayne-Dalton are responsible for a tangible employment action against Neal, but Manpower is not. *See Ellereth*, 524 U.S. at 762, 118 S. Ct. at 2268 (finding "[t]angible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates"). Under the Manpower/Wayne-Dalton contract, except for the attendance policy, Manpower removed employees from the Wayne-Dalton plant at the direction of the Wayne-Dalton supervisors, such as Woodson, not under its own volition. Further, Manpower did not terminate its relationship with Neal, but attempted to provide her various alternative employment

positions, which Neal did not utilize, and Manpower ended its search only when it learned that Neal had found another position.

Alternatively, following either the common-law servant rule or the joint employer doctrine, and assuming that the Florida Supreme Court would consider Manpower an "employer" under the FCRA, Manpower's motion for summary judgment must also be granted. Neal candidly admits that she never made Manpower aware of her charge of sexual harassment. Indeed, Neal's "theory of the case" is that she was planning to, but *never did*, speak to Manpower about her claims of sexual harassment before Manpower removed her from the Wayne-Dalton plant. Neal only made Manpower aware of her charge *after* she had been removed from the plant. In addition to providing that there was no basis for Manpower to "*know*" of the conduct Neal claims lead to her charge, the record is also devoid of any facts that establish that Manpower "*should have known*" of any instance of sexual harassment against Neal.

For the same reason, Neal cannot establish a *prima facie* case against Manpower for retaliation. Retaliation requires Neal to establish (1) that she engaged in a protected activity, (2) her employer was aware of that activity, (3) an adverse employment action, and (4) a causal link. *Nieves v. Palm Beach County*, 14 Fla. L. Weekly Fed. D223, 2000 WL 3310907, *4 (S.D. Fla. 2000). In order to prove the "causal link," the Eleventh Circuit has held, with respect to Title VII, that, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse

employment action." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *see also Clover v. Total Sys. Servs, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (awarding summary judgment to employer based on plaintiff's inability to prove employer's knowledge of protected activity); *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) (same); *cf. Johnson*, 234 F.3d at 507 (affirming summary judgment to employer on Title VII retaliation claim because no "causal link" possible where employee's protected expression occurred after adverse action). Neal has unequivocally stated in the record that she did not inform Manpower of any sexual harassment until after she was removed from the Wayne-Dalton plant.

The Court determines that there is no genuine issue of material fact to be determined at trial. Therefore, Manpower's motion for summary judgment is **GRANTED**.


## 2. Wayne-Dalton's Motion for Summary Judgment

Wayne-Dalton's motion for summary judgment does not present the same initial issues as Manpower's motion. Much of the case law that Neal cites in her memorandum in opposition of summary judgment supports considering Wayne-Dalton an "employer" under the FCRA, as the client company of a temporary employment agency. *See, e.g., Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488 (11th Cir. 1993); *Mullis*, 994 F. Supp. at 684–85 (citing *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 259 (4th Cir. 1997)); *cf. Hollis v. School Bd. of Leon County*, 384 So. 2d 661, 663 (Fla. 1st DCA 1980) (finding school board

responsible for torts of bus driver due to "organization and control"); *Beaver v. Jacuzzi*

*Brothers, Inc.*, 454 F.2d 284 (8th Cir. 1972) (in Arkansas diversity workers compensation

action, temporary employees only remedy was the *client* corporation's workers

compensation benefits). Because Woodson was an employee of Wayne-Dalton, Wayne-

Dalton has an "opportunity to guard against [his] misconduct" through training, screening

and monitoring of his performance. *Faragher*, 524 U.S. at 803, 118 S. Ct. at 2291; *cf.*

*Hollis*, 384 So. 2d at 663.   Accordingly, the vicarious employer liability reflected in the

FCRA is appropriately applied to Wayne-Dalton.

### a. sexual harassment

The FCRA prohibits employers from discriminating "against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, national origin, age, handicap or marital status." FLA.

STAT. § 760.10 (2001).   Sexual harassment can constitute discrimination based on sex for

purposes of the FCRA.   *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244–45 (11th Cir.

1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000)

(holding sexual harassment within Title VII).[14]

---

[14] Sexual harassment has traditionally been considered in two forms: harassment that does not result in tangible employment action ("hostile work environment" harassment), and harassment that does result in tangible employment action ("*quid pro quo*" harassment). *Johnson v. Booker T. Washington*, 234 F.3d 501, 508 (11th Cir. 2000).  Harassment by a supervisor can fall into either category. *Id.*  In *Johnson*, the Eleventh Circuit recognized that in *Ellereth* the Supreme Court "largely wiped out the usefulness of the terms 'hostile environment' and *quid pro quo*" and opted to apply the *Mendoza* test, irrespective of the terms "*quid pro quo*" or "hostile environment." *Id.* at 508 n.7.

To demonstrate sexual harassment, Neal must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Johnson*, 234 F.3d at 508–09; *see Mendoza*, 195 F.3d at 1245.

Viewing all evidence in the light most favorable to the non-moving party, Neal has made a sufficient *prima facie* showing to survive summary judgment on her sexual harassment claims. The first and third factors are easily disposed of. Wayne-Dalton does not dispute that Neal is a woman. Furthermore, the parties do not dispute whether, if the statements attributed to Woodson are viewed to be of a sexual nature, that harassment is based upon her sex. Neal's allegations, considered as a whole and viewed in a light most favorable to her, could establish that Woodson's statements and actions are motivated by sex. Further, Wayne-Dalton provides no alternative basis for Woodson to make the statements and undertake the actions that Neal attributes him with other than those statements being based upon her sex.

The second and fourth *Mendoza* factors are intertwined and will be considered in unison. The FCRA prohibits sexual harassment that is so severe and pervasive as to "alter the conditions of the victim's employment." *Oncale v. Sundowner Offshore Servs. Inc.*, 523

U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998) (quotation omitted).  In order to be severe and pervasive, harassment must be both subjectively and objectively severe and pervasive.  *See Johnson*, 234 F.3d at 509.   Harassment is subjectively severe and pervasive "if the complaining employee perceives the harassment as severe and pervasive." *Id.* Further, harassment is objectively severe and pervasive "if a reasonable person in the plaintiff's position would adjudge the harassment severe and pervasive." *Id.*  To determine whether harassment is objectively severe and pervasive, courts consider "the frequency of the conduct," "the severity of the conduct," "whether the conduct is physically threatening or humiliating, or a mere offensive utterance," and "whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246.

Neal clearly subjectively perceived Woodson's conduct as harassing.  Considering the four objective factors: the conduct was not infrequent (Neal points to a series of instances over her 24 days of employment), the conduct was severe (Woodson's alleged behavior included stating that Neal's "lips would look good on his dick," unconsentually squeezing her hip while she was working, and, when inferences are looked at most favorably to Neal, offering Neal money and less critical supervision in exchange for more favorable responses to sexual advances), and the conduct interfered with Neal's job performance (Woodson had Neal removed from the plant after she refused his advances).  While it could be argued that the conduct was not "physically threatening or humiliating," weighing all four factors together, when the facts and all inferences are viewed in the light most favorable to

the plaintiff, Woodson's alleged conduct towards Neal was sufficiently severe or pervasive to fall within the definition of sexual harassment. *See Johnson*, 234 F.3d. at 509.

Finally, there is a basis for holding Wayne-Dalton liable for Woodson's alleged harassment. Wayne-Dalton is strictly liable for Woodson's harassment if (1) Woodson was Neal's supervisor, and (2) Woodson took a tangible employment action against Neal as a result of the sexual harassment. *See id.* at 509–10; *see also Fargher*, 524 U.S. at 807, 118 S. Ct at 2275; *Ellerth*, 524 U.S. at 762–63, 118 S. Ct. at 2257 ("[A] tangible employment action taken by the supervisor becomes . . . the act of the employer. [T]he agency relation standard . . . will always be met when a supervisor takes a tangible employment action against a subordinate. [I]t would be implausable to interpret agency principles to allow an employer to escape liability . . . ."); *Llampallas v. Mini-Circuits, Lab. Inc.*, 163 F.3d 1236, 1247 (11th Cir. 1998) ("[A]ny time the harasser makes a tangible employment decision that adversely affect the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision."). Wayne-Dalton can avoid liability if (1) Woodson was not Neal's supervisor, or (2) if Woodson took no tangible employment action against Johnson. Wayne-Dalton makes neither claim. Indeed, there is no dispute that Woodson was Neal's supervisor at the Wayne-Dalton plant. Further, a tangible employment action is "a significant change in employment statutes, such as hiring, firing, failing to promote, reassignment with significantly different responsiblities, or a decision causing a significant change in benefits." *Johnson*, 234 F.3d at 511–12 (citing

*Ellerth*, 524 U.S. at 761, 118 S. Ct. at 2257); *see also Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (quotation and citation omitted) ("An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions or privileges of employment, deprives him or her of employment opportunties, or adversely affects his or her employment status.). Wayne-Dalton does not dispute that Woodson requested Neal be removed from the Wayne-Dalton plant, which Manpower followed pursuant to the Manpower/Wayne-Dalton agreement, effectively terminating her employment at the Wayne-Dalton plant.

Therefore, when all facts and inferences are viewed in the light most favorable to the non-moving party, Neal, there is sufficient evidence in the record to maintain a cause of action for sexual harassment. Accordingly, Wayne-Dalton's motion for summary judgment with regards to Neal's claim of sexual harassment is **DENIED**.

### b. retaliation

Neal also alleges that Wayne-Dalton, via Woodson, retaliated against her by having her removed from the Wayne-Dalton plant because she complained of Woodson's alleged harassment to coworkers and to her Leadperson, Sally Robertson. The FCRA provides:

> It is an unlawful employment practice for an employer . . . to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section, or because that person has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this section.

FLA. STAT. ANN. § 760.10(7) (2001).

In order to establish a *prima facie* case of retaliation under the FCRA, Neal must prove (1) she engaged in a statutorily protected activity, (2) her employer was aware of that activity, (3) she suffered an adverse employment action, and (4) the adverse action was causally related to the protected activity. *See Nieves*, 14 Fla. L. Weekly Fed. at D223, 2000 WL 33310907 at *4; *Raney*, 120 F.3d at 1196; *Meeks v. Computer Assocs. Int'l.*, 15 F.3d 1013, 1021 (11th Cir. 1994). Protected activities include (1) opposing employment practices made unlawful by the FCRA, and (2) participation in an investigation, proceeding or hearing, or making a charge. *See* FLA. STAT. § 760.10(7) (2001). Such activities need not be formal. *See Del Monaco v. United Parcel Serv.*, 47 F. Supp. 2d 1371, 1375 (S.D. Fla. 1999) (complaining to supervisor of discriminatory remark sufficient to establish "protected activity").

Once a plaintiff satisfies the elements of the *prima facie* case, a presumption of retaliation is created. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973); *see also Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999), *cert. denied*, 528 U.S. 966, 120 S. Ct. 402, 145 L. Ed. 2d 314 (1999). The defendant can defeat the presumption only by offering evidence of a legitimate, non-retaliatory reason for the adverse action. *See McDonnell Douglas*, 411 U.S. at 802–03, 93 S. Ct. at 1824; *Sullivan*, 170 F.3d at 1059. After the presumption is

eliminated, the burden shifts back to the plaintiff, who must then raise an issue of material fact as to whether the defendant's reason is pretexual. *See McDonnel Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825; *Sullivan*, 170 F.3d at 1059.

The facts, when viewed in the light most favorable to Neal, establish a *prima facie* case. While there is little dispute that Neal suffered an adverse employment action, there is a considerable dispute of fact about Neal's assertion that she spoke to her Leadperson, Sally Robertson, about Woodson's alleged sexual harassment immediately prior to her termination. Accepting Neal's allegations as true for summary judgment, an agent of Wayne-Dalton (Sally Robertson) had knowledge of Neal's complaint. If a juror were to believe Neal's testimony over Robertson's that complaints were made, a juror could reasonably infer that Robertson had made Woodson aware of Neal's informal complaints prior to her termination.

To defeat the presumption of retaliation, Wayne-Dalton sets forth a legitimate business reason for Neal's discharge, which Neal retorts by providing proof of pretext. Woodson claims that Neal was properly discharged because of her "poor work performance." Neal denies that her work was poor and asserts that her rejections of Woodson's proposals and her complaints to Robertson about Woodson's behavior were the true reason for her discharge. These disputed issues of fact rely largely on issues of credibility and require that this claim be resolved at trial. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999), *cert. denied*, 529 U.S.

1109, 120 S. Ct. 1962, 146 L. Ed. 2d 793 (2000) (stating courts "must avoid weighing conflicting evidence or making credibility determinations"). Accordingly, Wayne-Dalton's motion for summary judgment on Neal's claim of retaliation is **DENIED**.

### c. damages

Defendant Wayne-Dalton also moves the Court to grant partial summary judgment with regard to some of the remedies requested by the Plaintiff. For the reasons set forth below, Wayne-Dalton's motion for partial summary judgment with regard to Plaintiff's claims for front pay, complete back pay, reinstatement or injunctive relief are **GRANTED**. Additionally, for the reasons set forth below, Wayne-Dalton's motion for partial summary judgment with regard to Plaintiff's claim for punitive damages is **DENIED**.

#### (i) front pay, complete back pay, reinstatement or injunctive relief

Neal avers that if Wayne-Dalton is found liable for Woodson's actions at trial, she is entitled to relief on a series of bases, including front pay, complete back pay, reinstatement or injunctive relief. Wayne-Dalton, by integrating Manpower's motion for summary judgment into its own, moves the Court to determine that, because Neal admitted intentionally falsifying her employment application with Manpower—an offense for which it is undisputed that Neal would have been terminated—Neal is not entitled to front pay, complete back pay, reinstatement or injunctive relief.

In *Wallace v. Dunn Construction Company, Inc.*, 62 F.3d 374 (11th Cir. 1995), the

Eleventh Circuit considered this exact issue. The Eleventh Circuit determined that such "after-acquired evidence of the employee's wrongdoing bears on the specific remedy to be ordered." *Wallace*, 62 F.3d at 378 (quoting *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 358–59, 115 S. Ct. 879, 885, 130 L. Ed. 2d 852 (1995)). Where there is no genuine issue of fact as to whether an employee would have been terminated if the employer had known that the employee falsified the employment application and the plaintiff prevails on a retaliation claim or on a FCRA claim, "'neither reinstatement nor front pay [is] an appropriate remedy' because [the employer] would have fired [the employee] upon learning that she lied" on her employment application. *Wallace*, 62 F.3d at 380 (quoting *McKennon*, 513 U.S. at 361–62, 115 S. Ct. at 886). "Injunctive relief also will not be appropriate, as [the employee would] no longer be employed" with the employer. *Wallace*, 62 F.3d at 380. Furthermore, if the plaintiff prevails on his or her claims, "[t]he beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." *Id.* (quoting *McKennon*, 513 U.S. at 362, 115 S. Ct. at 886)(alteration in original).

In the instant case, Neal candidly admitted that she intentionally falsified the extent of her education and her employment history (Doc. 61, pp. 102–03; Doc. 60, p. 2; Doc. 71, ¶ 10). Further, it is undisputed that Manpower would have terminated Neal had it known that she intentionally falsified her employment application, which would have ended her employment at the Wayne-Dalton facility (Doc. 71, ¶ 11). Therefore, neither reinstatement,

front pay, nor injunctive relief are appropriate remedies. *See Wallace*, 62 F.3d at 380.

Furthermore, backpay is limited to the date of Neal's discharge from the Wayne-Dalton

facility to the date of Neal's sworn deposition. *See id.*

Accordingly, Wayne-Dalton's motion for summary judgment on Neal's claims for

relief of front pay, reinstatement, injunctive relief, and backpay after the date of her sworn

deposition is **GRANTED**.


### (ii) punitive damages

Neal also avers that if Wayne-Dalton is found liable for Woodson's actions at trial,

she is entitled to punitive damages. Wayne-Dalton, by integrating Manpower's motion for

summary judgment into its own, moves the Court for summary judgment on Neal's claim

for punitive damages based on Wayne-Dalton's adoption of a sexual harassment policy.

Recently, in *Kolstad v. American Dental Assn.*, 527 U.S. 526, 119 S. Ct. 2118, 114

L. Ed. 2d 494 (1999), the United States Supreme Court considered punitive damages under

a Title VII sex discrimination claim.[15]    There, the Court determined that "[w]here an

employer has undertaken such good faith efforts at Title VII compliance, it demonstrat[es]

that it never acted in reckless disregard of . . . protected rights." *Kolstad*, 527 U.S. at 544,

---

[15] This Court's basis for jurisdiction is diversity, and the Plaintiff's claim has been brought solely under the FCRA. In their respective memorandums of law, to support of their positions on the issue of punitive damages, both parties cite federal cases considering Title VII issues, implicitly establishing that they believe Title VII precedent to guide this Court's application of Florida law on the issue of punitive damages. With this basis, the Court proceeds in its analysis.

119 S. Ct. at 2129 (quotation omitted) (alterations in original).  Certainly, "a written non-discrimination policy is one indication of an employer's efforts to comply with Title VII." *Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000), *petition for cert. filed*, 69 U.S.L.W. 3740 (2001); *see also Harris v. L.L. Wings Inc.*, 132 F.3d 978, 983, 984 (4th Cir. 1997) (noting "[i]n some cases, the existence of a written policy *instituted in good faith* has operated as a total bar to employer liability for punitive damages" and concluding that "the institution of a written sexual harassment policy goes a long way towards dispelling any claim about the employer's 'reckless' or 'malicious' state of mind"(emphasis added)). However, "a written statement, without more, is insufficient to insulate an employer from punitive damages liability." *Romano*, 233 F.3d at 670; *see Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1010 (8th Cir. 2000) (written policy alone "does not suffice, as a matter of law . . . to establish good faith efforts"); *EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1248 (10th Cir. 1999) (written policy "alone is not enough" to avoid punitive damages).  Rather, a defendant "must also show that efforts have been made to implement its anti-discrimination policy, through education of its employees and active enforcement of its mandate." *Romano*, 233 F.3d at 670.  Without requiring a showing of active enforcement of the sexual harassment policy, a company could insulate itself from liability by adopting a policy that it has no intention to enforce, thwarting the preventative purpose of the statute. *See Kolstad*, 527 U.S. at 545, 119 S. Ct. at 2129; *Romano*, 233 F.3d at 671.

In the instant case, Wayne-Dalton has established that it issued a sexual harassment

policy and that the policy was posted on six bulletin boards, by the time clocks that employees pass each day of work. However, simply establishing that it issued a sexual harassment policy is not sufficient to allow the Court to remove the issue from the jury's consideration. Wayne-Dalton also needed to set forth an undisputed factual basis in the record that it was engaged in active enforcement of the policy, such as proof of the distribution of such materials, the instruction of the policy to its supervisors, or an active mechanism for renewing employee's awareness of the policies through either specific education programs or periodic redissemination or revision of its written materials. *Romano*, 233 F.3d at 670. Further, the record is also absent of any evidence Wayne-Dalton could demonstrate that Wayne-Dalton supervisors were trained to prevent discrimination from occurring, or any examples where the sexual harassment policy was successfully followed. *See id.* While proof of all of these factors are not required, the singular presentation of the existence of a policy that is posted in the Wayne-Dalton facility is not sufficient to justify a finding, as a matter of law, that a good faith effort to comply with the statute exists. *See id.* Because Wayne-Dalton has not met its burden of proof in the record, Defendant's motion for summary judgment on the remedy of punitive damages is **DENIED**.

## IV. SUMMARY

The Court's ruling in this matter may be summarized as follows, and IT IS HEREBY

ORDERED:

1.    Wayne Dalton's motion to strike (Doc. 94) is **DENIED** as moot.

2.    Manpower's motion for summary judgment (Doc. 70) is **GRANTED**.

3.    Wayne-Dalton's motion for summary judgment (Doc. 60) as to Plaintiff's claims of sexual harassment and retaliation is **DENIED**. Wayne-Dalton's motion for summary judgment on the remedies of front pay, reinstatement, injunctive relief, back pay after the date of Plaintiff's sworn deposition (Doc. 60) is **GRANTED**. Wayne-Dalton's motion for summary judgment on the remedy of punitive damages (Doc. 60) is **DENIED**.

**ORDERED** on this **17th** day of September 2001.

_____
Lacey A. Collier
United States District Judge